## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL NO. 1:11-CR-361** |
| | : | |
| **v.** | : | **(Judge Conner)** |
| | : | |
| **TRISTAN GREEN,** | : | |
| | : | |
| **Defendant** | : | |

## MEMORANDUM

In August 2012, a jury convicted defendant Tristan Green of one count of armed bank robbery in violation of 18 U.S.C. § 2113(d) and one count of carrying, using, and brandishing a firearm during that armed bank robbery in violation of 18 U.S.C. § 924(c)(1)(A).  Green moves the court *pro se* pursuant to 28 U.S.C. § 2255 to vacate, set aside, or correct sentence based on perceived errors by the court, the government, and Green's counsel prior to and during trial.  Green has also filed a supplemental motion, through appointed counsel, seeking to vacate his Section 924(c) conviction based on the United States Supreme Court's decision in United States v. Davis, 588 U.S. ___, 139 S. Ct. 2319 (2019).

## I.   Factual Background & Procedural History

The charges in this case arose from the September 16, 2011 robbery of the Fulton Bank located in Etters, Pennsylvania.  The evidence adduced at trial established that two masked men wielding firearms robbed the bank before fleeing the scene in a black Chevy Blazer.  Authorities stopped the Blazer approximately one and a half hours after the robbery.  Green's codefendant, Willie Elmore, was driving the vehicle and taken into custody.  A search of the Blazer revealed a large

amount of cash and printed MapQuest directions to 1478 Whiteford Road in York, Pennsylvania, the address where Green's grandparents resided and which Green listed as his residence on his driver's license.  Two eyewitnesses, Dawn Foose and Julia Korick, informed authorities that one of the robbers had briefly lowered his mask during the robbery.  During separate photographic lineups, Foose and Korick identified Green as the robber who lowered his mask; neither identified Elmore.

On December 20, 2011, the grand jury returned a two-count indictment charging Green and Elmore with armed bank robbery and carrying, using, and brandishing firearms in furtherance of that bank robbery.  The court appointed John A. Abom, Esquire, whom we refer to as "trial counsel," to represent Green. Trial counsel promptly moved to suppress the eyewitness identifications, arguing that the photographic arrays were unnecessarily suggestive because Green was the only individual whose photograph displayed parted hair and thick braids or dreadlocks and the only individual depicted in light-colored clothing.  After an evidentiary hearing, we denied Green's motion.

Green and Elmore proceeded to trial on August 14, 2012.  After three days of evidence, the jury returned a guilty verdict against both defendants on both counts. Green moved for a new trial, arguing primarily that the eyewitness testimony was "so unreliable" as to prevent any rational juror from finding Green guilty beyond a reasonable doubt.  (Doc. 111 ¶¶ 3(a), 4(a); Doc. 121 ¶ 7(a)).  We denied that motion, finding that the independent eyewitness identifications were sufficient to support the jury's verdict.

Because Green was designated a career offender and had been convicted of a Section 924(c) offense, his Guidelines imprisonment range was 360 months to life. The court sentenced Green to 360 months' imprisonment, consisting of a 276-month term on Count 1 and an 84-month mandatory-minimum term on Count 2, required by statute to run consecutively to the term imposed on Count 1.  Green's conviction and sentence were affirmed on direct appeal.  See United States v. Green, 543 F. App'x 266 (3d Cir. 2013) (nonprecedential).

Green timely filed the instant *pro se* Section 2255 motion, challenging actions taken (and not taken) by trial counsel, government counsel, and the court.  Green subsequently filed a supplemental Section 2255 motion through appointed counsel, invoking the Supreme Court's decision in Johnson v. United States, 576 U.S. 591 (2015).  Proceedings were then stayed at appointed counsel's request while a series of cases stemming from Johnson[1] unfolded at the Supreme Court.  In the interim, Green filed a *pro se* motion to expand the record, asking the court to consider "expert" opinion evidence concerning the skin tone of the robbers seen in the bank's surveillance footage.  On March 13, 2020, appointed counsel filed a second supplemental motion under Section 2255, this time relying on the Supreme Court's decision in Davis.  Green's *pro se* motions and counseled motions are now fully briefed and ripe for disposition.

---

[1] See Welch v. United States, 578 U.S. ___, 136 S. Ct. 1257 (2016); Sessions v. Dimaya, 584 U.S. ___, 138 S. Ct. 1204 (2018); United States v. Davis, 588 U.S. ___, 139 S. Ct. 2319 (2019).

## II.   **Standard of Review**

### A.   **Section 2255**

Under Section 2255, a federal prisoner may move the sentencing court to vacate, set aside, or correct the prisoner's sentence.  28 U.S.C. § 2255.  Courts may afford relief under Section 2255 on a number of grounds including, *inter alia*, "that the sentence was imposed in violation of the Constitution or the laws of the United States."  Id. § 2255(a); see also 28 U.S.C. § 2255 Rule 1(a).  The statute provides that, as a remedy for an unlawfully imposed sentence, "the court shall vacate and set the judgment aside and shall discharge the prisoner or resentence him or grant a new trial or correct the sentence as may appear appropriate."  28 U.S.C. § 2255(b).  The court accepts the truth of the defendant's allegations when reviewing a Section 2255 motion unless those allegations are "clearly frivolous based on the existing record." United States v. Booth, 432 F.3d 542, 545 (3d Cir. 2005).  A court is required to hold an evidentiary hearing when the motion "allege[s] any facts warranting § 2255 relief that are not clearly resolved by the record."  United States v. Tolliver, 800 F.3d 138, 141 (3d Cir. 2015) (quoting Booth, 432 F.3d at 546).  Vague and conclusory claims, however, are insufficient to entitle a defendant to relief and require no "further investigation" by the district court.  See United States v. Thomas, 221 F.3d 430, 437 (3d Cir. 2000) (citing United States v. Dawson, 857 F.2d 923, 928 (3d Cir. 1988)); see also Sepulveda v. United States, 69 F. Supp. 2d 633, 639-40 (D.N.J. 1999) (citing Blackledge v. Allison, 431 U.S. 63 (1977)).

**B.      Ineffective Assistance of Counsel**

A collateral attack based on ineffective assistance of counsel is governed by the two-pronged test set forth in Strickland v. Washington, 466 U.S. 668 (1984). To prevail on such a claim, a defendant must demonstrate that (1) counsel's representation fell below an objective level of reasonableness based on prevailing professional norms, and (2) the deficient representation was prejudicial. See id. at 687-88. The defendant bears the burden of proving both prongs. See id. at 687.

To determine whether counsel has satisfied the objective standard of reasonableness under the first prong, courts must be "highly deferential" toward counsel's conduct. Strickland, 466 U.S. at 689. There is a strong presumption that counsel's performance falls within the broad range of reasonable professional assistance. See United States v. Gray, 878 F.2d 702, 710 (3d Cir. 1989). Only a "rare claim" of ineffectiveness of counsel should succeed "under the properly deferential standard to be applied in scrutinizing counsel's performance." Id. at 711 (citing Strickland, 466 U.S. at 689-90). To satisfy the prejudice prong, the defendant must establish a reasonable probability that, but for counsel's errors, the outcome of the proceeding "would have been different." Strickland, 466 U.S. at 694. The district court need not conduct its analysis of the two prongs in a particular order or even address both prongs of the inquiry if the defendant makes an insufficient showing in one. See Strickland, 466 U.S. at 697; United States v. Lilly, 536 F.3d 190, 196 (3d Cir. 2008).

### III.   <u>Discussion</u>

Green's pursuit of collateral relief has proceeded in fits and starts over the past five years.  After some procedural hurdles and a stay while the <u>Johnson</u> progeny developed at the Supreme Court, the following matters are before us: Green's counseled claims invoking the Supreme Court's <u>Davis</u> decision, (<u>see</u> Doc. 260), and his manifold *pro se* claims sounding in ineffective assistance of counsel, prosecutorial misconduct, abuse of discretion, and actual innocence, (<u>see</u> Docs. 186, 187, 237, 252, 253).  We begin with the <u>Davis</u> claim.

### A.   <u>Davis</u> and Green's Section 924(c) Conviction

Green seeks to vacate his Section 924(c) conviction and the resulting consecutive, mandatory minimum sentence.[2]  Section 924(c) establishes enhanced punishments for any person who uses or carries a firearm "during and in relation to," or who possesses a firearm "in furtherance of," a "crime of violence."  18 U.S.C. § 924(c)(1)(A).  The length of the mandatory minimum term depends on whether the defendant uses, carries, or possesses the firearm (five years); brandishes the firearm (seven years); or discharges the firearm (ten years).  <u>See</u> <u>id.</u> § 924(c)(1)(A)(i)-(iii).  A felony offense is a "crime of violence" for purposes of Section 924(c) if it "has as an element the use, attempted use, or threatened use of physical force against

---

[2] Appointed counsel initially argued that <u>Johnson</u> also applies to invalidate Green's designation as a career offender under Section 4B1.1 of the United States Sentencing Guidelines.  (<u>See</u> Doc. 211 at 10-12, 19-22).  This argument has since been foreclosed by the Supreme Court's decision in <u>Beckles v. United States</u>, 580 U.S. ___, 137 S. Ct. 886 (2017).  In <u>Beckles</u>, the Court rejected a challenge to the residual clause of the Guidelines' career-offender definition, concluding that the advisory Guidelines are not subject to vagueness challenges under the Due Process Clause.  <u>Beckles</u>, 135 S. Ct. at 895.

the person or property of another," id. § 924(c)(3)(A), or "by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense," id. § 924(c)(3)(B). Courts refer to these clauses as the "elements clause" and "residual clause," respectively. United States v. Robinson, 844 F.3d 137, 140-41 (3d Cir. 2016), cert. denied, 138 S. Ct. 215 (2017), abrogated on other grounds by Davis, 139 S. Ct. 2319.

As the case law concerning crime-of-violence predicates has evolved, so have Green's arguments. Green first relied on the Supreme Court's decision in Johnson v. United States, 576 U.S. 591 (2015), which struck down the Armed Career Criminal Act's crime-of-violence residual clause as unconstitutionally vague. Green argued that the residual clause of Section 924(c) is virtually identical to the Armed Career Criminal Act's residual clause and should be similarly invalidated. He further argued that his conviction for armed bank robbery does not qualify as a crime of violence under Section 924(c)'s elements clause, effectively eliminating both clauses as support for his firearm conviction. In 2018, the Third Circuit rejected the latter argument, concluding that armed bank robbery under 18 U.S.C. § 2113(d) qualifies categorically as a crime of violence under Section 924(c)'s elements clause. See United States v. Johnson, 899 F.3d 191, 202-04 (3d Cir. 2018) (citing United States v. Wilson, 880 F.3d 80, 84-85 (3d Cir. 2018)). Then in 2019, the Supreme Court decided Davis, which invalidated Section 924(c)'s residual clause as unconstitutionally vague. Davis, 139 S. Ct. at 2336.

Green maintains that his conviction for armed bank robbery still does not qualify as a crime of violence under Section 924(c). Green reprises here the same

arguments that he raised (and we rejected) in another case earlier this year.  See

United States v. Green, No. 1:12-CR-9, ___ F. Supp. 3d ___, 2020 WL 3263629 (M.D.

Pa. June 17, 2020) (Conner, J.), appeal filed, No. 20-2459 (3d Cir. July 16, 2020).  He

contends that, after Davis, only the elements clause remains to establish a predicate

crime of violence and that, notwithstanding the Third Circuit's Johnson decision,

his armed bank robbery conviction cannot qualify under that clause because it is

unclear whether the jury convicted him as a principal, an aider and abettor, or a

Pinkerton coconspirator.  As we previously explained, the flaw in Green's argument

is that it confuses theories of criminal responsibility and the substantive offense of

conviction.  See id. at *4-6.

    As for aiding and abetting, the unanimous consensus among the courts of

appeals is that it "does not matter" whether a defendant is convicted as a principal

or an aider and abettor since aiding and abetting "is not a separate crime."  See

United States v. McKelvey, 773 F. App'x 74, 75 (3d Cir. 2019) (nonprecedential)[3];

see also United States v. Garcia-Ortiz, 904 F.3d 102, 109 (1st Cir. 2018); United

States v. Brayboy, 789 F. App'x 384, 385 (4th Cir. 2020) (nonprecedential); United

---

[3] In McKelvey, the court of appeals concluded that aiding and abetting
Hobbs Act robbery qualifies as a crime of violence under Section 924(c)'s elements
clause.  See McKelvey, 773 F. App'x at 75.  We recognize that Davis has reopened
debate, at least in the Third Circuit, as to whether Hobbs Act robbery is a crime of
violence under the elements clause.  See, e.g., United States v. Copes, No. 19-1494
(3d Cir.) (appeal pending as to whether Hobbs Act robbery is a crime of violence);
United States v. Corley, No. 18-3633 (3d Cir.) (same as to both Hobbs Act robbery
and aiding and abetting Hobbs Act robbery).  Davis, however, does not disturb
McKelvey's separate reasoning on the nature of aiding-and-abetting liability.  We
find that reasoning, albeit nonbinding, to be persuasive: it is cogent, compelling,
and consonant with the decisions of every other court of appeals faced with this
issue.  See Green, 2020 WL 3263629, at *4-5 (collecting cases).

States v. Richardson, 948 F.3d 733, 741-42 (6th Cir. 2020); United States v. Grissom, 760 F. App'x 448, 454 (7th Cir. 2019); Johnson v. United States, 774 F. App'x 334, 334-35 (8th Cir. 2019) (nonprecedential); United States v. Deiter, 890 F.3d 1203, 1214-16 (10th Cir. 2018); In re Colon, 826 F.3d 1301, 1305 (11th Cir. 2016).  We agreed with the *ratio decidendi* of these courts in Green, and we reaffirm that agreement now.

Green was convicted of armed bank robbery under Section 2113(d), and our court of appeals has held that armed bank robbery is a crime of violence for purposes of Section 924(c)'s elements clause.  See Johnson, 899 F.3d at 202-04. Whether Green was convicted as an aider and abettor or a principal is of no moment: either way, he is treated as having committed the substantive crime of armed bank robbery.  See McKelvey, 773 F. App'x at 75; see also Rosemond v. United States, 572 U.S. 65, 70 (2014) (aiding-and-abetting statute "reflects a centuries-old view of culpability: that a person may be responsible for a crime he has not personally carried out if he helps another to complete its commission" (citation omitted)).  Assuming *arguendo* that the jury convicted Green of armed

bank robbery on an aiding-and-abetting theory, his conviction qualifies as a crime of violence under Section 924(c).[4]

The same rationale defeats Green's argument that a conviction premised on Pinkerton cannot qualify as a crime of violence. Under the Pinkerton doctrine, a defendant "may be held responsible for the substantive crimes committed by a co-conspirator in furtherance of the conspiracy, even if [he] neither participates in the crimes nor has any knowledge of them." United States v. Gonzalez, 918 F.2d 1129, 1135 (3d Cir. 1990) (citing Pinkerton v. United States, 328 U.S. 640, 646-47 (1946)). The doctrine establishes a "theory of liability," see United States v. Lopez, 271 F.3d 472, 480 (3d Cir. 2001), not a separate offense. Like aiders and abettors, defendants convicted of a substantive crime on a Pinkerton theory are treated as if they had committed that crime themselves. See United States v. Bailey, 840 F.3d 99, 112 (3d Cir. 2016) (quoting Gonzalez, 918 F.2d at 1135); United States v. Casiano, 113 F.3d 420, 427 (3d Cir. 1997) (same). Thus, a Pinkerton conviction is not a conviction for

---

[4] The only authority identified by Green (other than the dissent in *In re Colon*) is the Ninth Circuit's decision in United States v. Innie, 7 F.3d 840 (9th Cir. 1993). That decision is inapposite. The court in Innie held that a conviction under the accessory-after-the-fact statute, 18 U.S.C. § 3, does not qualify as a crime of violence under the elements clause of 18 U.S.C. § 16, which supplies the definition of "crime of violence" for many federal statutes. See Innie, 7 F.3d at 850. But an accessory after the fact is materially different from an aider and abettor. An aider and abettor facilitates the principal's commission of the underlying offense and is "punishable as a principal." See 18 U.S.C. § 2(a); see also United States v. Nolan, 718 F.2d 589, 592 (3d Cir. 1983) (quoting Nye & Nissen v. United States, 336 U.S. 613, 619 (1949)). An accessory after the fact becomes involved *after* the offense has been committed and is generally subject to "one-half" the maximum punishment applicable to the principal. See 18 U.S.C. § 3.

*conspiring* to commit an offense; it is a conviction for *committing* that offense based on a theory of vicarious coconspirator liability.  Green, 2020 WL 3263629, at *5.

Green's assertion that "[c]onspiracy is not a 'crime of violence'" misses this critical distinction.  (See Doc. 260 at 18).  Green was not convicted of conspiring to commit armed bank robbery; he was convicted of committing armed bank robbery as either a principal, aider and abettor, or vicariously liable coconspirator.  (Doc. 106 at 1).  We again reject Green's attempt to conflate a substantive armed-bank-robbery conviction based on Pinkerton with a conviction for conspiracy to commit that offense.[5]  See Green, 2020 WL 3263629, at *5; see also Abouhalima v. United States, No. 20-CV-834, 2020 WL 3318031, at *2 (S.D.N.Y. June 18, 2020) (holding that Pinkerton instruction did not convert qualifying conviction for assaulting a federal officer into nonqualifying conviction for conspiring to do so), appeal filed, No. 20-2327 (2d Cir. July 23, 2020); Corbett v. United States, No. 3:16-CV-330, 2020 WL 1495456, at *5 (W.D.N.C. Mar. 26, 2020) (holding same as to Hobbs Act robbery and Hobbs Act conspiracy), appeal filed, No. 20-6754 (4th Cir. May 21, 2020).

---

[5] Green points to United States v. Berry, No. 3:09-CR-19, 2020 WL 591569 (W.D. Va. Feb. 6, 2020), where the court held that the defendant's Section 924(c) conviction had to be vacated because the jury's verdict contemplated either attempt to commit Hobbs Act robbery or conspiracy to commit Hobbs Act robbery, the first of which might have been a crime of violence and the second of which the Fourth Circuit has said is not.  (Doc. 260 at 14 n.8 (citing Berry, 2020 WL 591569, at *3 (citing United States v. Simms, 914 F.3d 229 (4th Cir. 2019) (*en banc*)))).  Berry is obviously distinguishable in that it concerned the separate substantive crimes of attempting and conspiring to commit Hobbs Act robbery.  Id.; see 18 U.S.C. § 1951(a).

Section 924(c)'s elements clause does not differentiate between principal, aider and abettor, and vicariously liable coconspirator.  In other words, it matters not how a defendant commits a qualifying crime of violence, only whether a jury finds that he committed it.  Armed bank robbery is categorically a crime of violence for purposes of the elements clause of Section 924(c), <u>Johnson</u>, 899 F.3d at 202-04, and the jury convicted Green of armed bank robbery.  We conclude that Green's armed bank robbery conviction qualifies as a crime of violence under Section 924(c)'s elements clause.

## B.      Green's *Pro Se* Claims

Green raises a litany of claims in his *pro se* motion and various briefs.  (Docs. 186, 187, 191, 237, 252, 253).  Although Green's complaints are not neatly framed, it appears that he believes he was prejudiced by each of the following: *first*, by being tried alongside his codefendant; *second*, by the testimony of a government agent which Green claims was false and inadmissible; *third*, by admission of purportedly altered surveillance footage; *fourth*, by defense counsel's failure to challenge victim testimony; and *fifth*, by alleged prosecutorial misconduct.  We take up each claim in turn.[6]

---

[6] We find that an evidentiary hearing is unnecessary in this case.  We accept the truth of Green's allegations unless they are "clearly frivolous," <u>Booth</u>, 432 F.3d at 545-46, and vague or conclusory allegations "may be disposed of without further investigation," <u>Thomas</u>, 221 F.3d at 437.  As we observe throughout, nearly all of Green's claims fall into one of these two categories.  For the few that do not, we find that the record of the case "show[s] conclusively that [Green] is not entitled to relief."  <u>Booth</u>, 432 F.3d at 545-46 (quoting 28 U.S.C. § 2255 Rule 4(b)); <u>see</u> <u>United States v. Scripps</u>, 961 F.3d 626, 631-32 (3d Cir. 2020) (hearing is required unless "it can be conclusively shown that [the movant] cannot make out a claim" (quoting <u>United States v. Lilly</u>, 536 F.3d 190, 195 (3d Cir. 2008))).

### 1.      *Joint Trial of Green and Elmore*

Green first attacks trial counsel's failure to seek severance of the defendants' cases for trial.  (See Doc. 187 at 4; Doc. 237 at 2).  Green's argument in this respect is spare: he asserts only that separate trials would have put "the government's alleged misconduct . . . under severe scrutiny" and that "[p]lacing [Green] side-by-side with Mr. Elmore . . . significantly prejudiced [Green] due to the government's weak case against [Green]."  (Doc. 237 at 2).  Although Green does not explicitly say so, his invocation of United States v. Frost, 61 F.3d 1518 (11th Cir. 1995), suggests that he believes his and Elmore's defenses were inconsistent to the point that the jury could not acquit one without convicting the other.  (See Doc. 237 at 2 (quoting Frost, 61 F.3d at 1526)).

We cannot conclude that trial counsel was ineffective in failing to seek a severance.  "There is a preference in the federal system for joint trials of defendants who are indicted together."  Zafiro v. United States, 506 U.S. 534, 537 (1993).  It is not enough to justify a severance that defendants' respective defenses are "mutually antagonistic" or even that a defendant can demonstrate articulable prejudice from joinder.  See id. at 538-39; see also United States v. Voigt, 89 F.3d 1050, 1094 (3d Cir. 1996) (citing Zafiro, 506 U.S. at 539).  Nor is severance required "merely because [the defendants] may have a better chance of acquittal" if tried separately.  Zafiro, 506 U.S. at 540 (citations omitted).  Rather, we may grant a severance only if there is a "serious risk" that failing to do so "would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt

or innocence." Id. at 539.  A limiting instruction will often suffice to eliminate any

risk of prejudice.  Id.

There was no reason to move for severance in this case.  Green's and

Elmore's defenses were entirely reconcilable.  Green denied being in the bank and

challenged the reliability of the eyewitness identifications of him.  Elmore denied

being the getaway driver and provided alternative explanations for circumstantial

evidence found in his vehicle.  Neither pointed their finger directly at the other; in

fact, they denied having any knowledge of and tried to distance themselves from

one another.  The jury could have easily accepted one of their defenses without

necessarily having to reject the other.

Because the defendants were not unfairly tried together, any motion to sever

would have been unsuccessful.  And it is well settled that defense counsel cannot

be deemed ineffective for failing to raise a meritless argument.  See United States

v. Bui, 795 F.3d 363, 366-67 (3d Cir. 2015) (quoting United States v. Sanders, 165

F.3d 248, 253 (3d Cir. 1999)).  Accordingly, we will deny Green's motion on this

ground.

### 2.    *Agent Nawrocki's Testimony*

Green next takes issue with the trial testimony of FBI Special Agent

Christopher Nawrocki.  Green challenges Special Agent Nawrocki's testimony

that, when he mentioned Green's name during Elmore's interview, "Elmore's head

snapped towards us very quickly and he began asking us questions."  (8/16/12 Trial

Tr. 26:4-13).  Green argues that trial counsel should have objected to this testimony

as unduly surprising because it was not disclosed by the government or included in
Special Agent Nawrocki's reports.

The trial record rebuts any ineffective-assistance claim concerning
admissibility of Special Agent Nawrocki's testimony.  Green's trial counsel *did*
object to admission of this statement.  (See 8/16/12 Trial Tr. 14:10-25:19).  Trial
counsel argued—strenuously—that Elmore's nonverbal reaction was an inculpatory
statement by a codefendant implicating Bruton v. United States, 391 U.S. 123 (1968),
that should have been disclosed under the court's discovery order.  (See 8/16/12
Trial Tr. 14:19-15:22, 18:16-21, 20:3-23:20).  And counsel repeatedly noted his
surprise at the evidence being disclosed for the first time at trial.  (See id. at 15:1-5,
18:19-21, 20:8-19).  The court recessed to carefully consider counsel's argument
before ultimately overruling it, (see id. at 24:4-25:20), and the Third Circuit affirmed
that evidentiary ruling on appeal, see United States v. Green, 543 F. App'x 266, 269-
70 (3d Cir. 2013) (nonprecedential).  That counsel's argument was ultimately
unsuccessful does not render counsel's performance ineffective.  At bottom, Green
is attempting to revisit an issue that was already fully litigated before and rejected
by both the trial court and the court of appeals.  This he cannot do.  See United
States v. Travillion, 759 F.3d 281, 288 (3d Cir. 2014) (citing United States
v. DeRewal, 10 F.3d 100, 105 n.4 (3d Cir. 1993)).

Ostensibly recognizing this, Green tries a new approach: he "postulates"
that Special Agent Nawrocki committed perjury, that the government knew it, and
that his trial counsel failed to address it.  (See Doc. 187 at 6-7; see also Doc. 252 at 1-
3).  Specifically, Green avers that Special Agent Nawrocki must have fabricated his

CASE HEADER

testimony about showing a photograph of Green to Elmore and about Elmore's

reaction to Green's name because neither is documented in Special Agent

Nawrocki's interview report.  (Doc. 187 at 5-7).  Green argues that Special Agent

Nawrocki's testimony is further undermined by Sergeant Steven Lutz's testimony

"that Green became a suspect on September 23, 2011," one week after Elmore's

interview.  (Id. at 5-6).

        Neither argument supports a claim that the government knowingly relied

on perjured testimony.  That Special Agent Nawrocki failed to document aspects of

his interview with Elmore does not render his testimony about the omitted aspects

necessarily false.  It merely raises a credibility question for the jury.  Green's trial

counsel appropriately noted as much during his closing argument, indicating that

the absence of certain information from Special Agent Nawrocki's interview report

was conspicuous.  (See 8/16/12 Trial Tr. 235:11-236:8).  Green's other argument—

that Sergeant Lutz contradicted Special Agent Nawrocki's testimony about when

Green became a suspect—misreads the trial transcript.  Sergeant Lutz testified only

that law enforcement linked Green to a particular address one week after Elmore's

interview; he did not state that Green first became a suspect on that date.  (See

8/15/12 Trial Tr. 235:5-236:2).  Any outright claim of perjury on these grounds would

have been pure, unsupported conjecture and rejected as meritless.  See Bui, 795

F.3d at 366-67 (quoting Sanders, 165 F.3d at 253).

        In sum, Green identifies no support for his cursory allegation of perjury (or

for his more severe claim that both government and defense counsel knew of it and

either encouraged it or failed to act), and we discern none in the record.  Whether

framed as a claim of prosecutorial misconduct or ineffective assistance, this ground for relief is baseless.[7]

### 3.  *Bank Surveillance Video*

Green's third claim is twofold: he contends that trial counsel failed to challenge the chain of custody and authenticity of what Green believes to be "purposefully altered" video surveillance footage, and he asserts that the court abused its discretion in determining that "bad sectors" of the footage were not relevant.  (Doc. 187 at 8-13; Doc. 237 at 8).[8]

The insinuation of Green's first argument is that counsel knew that the bank's video surveillance footage was unreliable and failed to object to it.  He first suggests that the surveillance footage was "potentially altered" and that the video "appears to be doctored," (Doc. 187 at 12), but later leaps to the definitive assertion

---

[7] Green also claims in a supplemental brief that Special Agent Nawrocki "fabricated" a confidential informant during his grand jury testimony.  (See Doc. 237 at 4).  According to Green, Special Agent Nawrocki told the grand jury that a confidential informant linked Green to the armed bank robbery.  (See id.)  Green asserts that his counsel should have either moved to dismiss the indictment because of this purportedly false testimony, (id.), or used the testimony to impeach Special Agent Nawrocki at trial, (Doc. 252 at 5-6).  Assuming *arguendo* that Special Agent Nawrocki did so testify before the grand jury, Green offers nothing but his own conclusory say-so to show that the statement was untruthful, and he fails to identify what statement at trial the testimony would have contradicted.  This is not for lack of opportunity, as the court has before it a half-dozen briefs from Green attempting to bolster various aspects of his claims.  Absent any support, we cannot conclude that trial counsel was ineffective for failing to address this purported fabrication.

[8] To the extent it is cognizable under Section 2255, any independent abuse-of-discretion claim is procedurally defaulted: the claim was not raised at trial or on direct appeal and Green has proffered no reason why it could not have been.  See Travillion, 759 F.3d at 288 n.11 (citing DeRewal, 10 F.3d at 105 n.4).  In deference to Green's *pro se* status, we construe this claim as asserting that trial counsel was ineffective for failing to object to that perceived abuse.

that "[i]t is clear that [t]he bank footage has been purposefully altered," (Doc. 237 at 8). Green offers no support for this conclusory statement, does not describe how he believes the footage was altered or who altered it, and fails to articulate exactly how the purported alterations impacted the outcome. To the extent Green implies that the so-called "bad sectors" of the footage are indicative of tampering, that issue was squarely addressed at trial: Susan Follmer, Fulton Bank's corporate physical security manager, explained that the hard drive which recorded the footage the day of the robbery "had some bad sectors on it which caused some images not to record onto the hard drive," (8/14/12 Trial Tr. 131:2-10), and that this can occur when the hard drive is being overwritten as part of its regular recording processes, (see id. at 131:11-21). There is simply no reason to believe that the footage was doctored, and Green does not even claim to have evidence to back up his allegation. Any objection by trial counsel that the bad sectors were deliberately created by either the government or some unknown third party would have been entirely speculative and promptly overruled. Trial counsel cannot be deemed ineffective for failing to posit that an unknown person may have tampered with the footage.[9] See Bui, 795 F.3d at 366-67.

---

[9] Green asserts that Follmer "was instructed by the prosecutor" that the hard drive recording equipment had created bad sectors during the overwriting process. (Doc. 187 at 12). But the relevant portion of the transcript makes clear that the prosecutor was explaining his understanding of how such errors occurred and that Follmer merely confirmed that understanding to be accurate. (See 8/14/12 Trial Tr. 131:11-21). Green also suggests that trial counsel was ineffective in failing to question Follmer about the bad sectors of the video. (See Doc. 187 at 12). But Follmer had already explained the cause of the bad sectors on direct examination, and Green has not identified an objective basis on which trial counsel could have or should have challenged that testimony.

In a related argument, Green contends that trial counsel should have objected to the court's "abuse of discretion" with respect to the relevance of the bad sectors of the surveillance footage.  The court observed during trial that "the robbery was initiated at 9:47:48 and ended at . . . 9:50:52," and that the bad sectors occurred "around 9:50:27 with a few exceptions."  (8/14/12 Trial Tr. 134:5-13).  The court asked counsel whether the "bad sector end" was relevant since "the robbery ended at the relevant portion of the tape," counsel for the government agreed that it was not relevant, and trial counsel did not argue otherwise.  (Id. at 134:5-16).

Green asserts that the "few exceptions" noted by the court "are hardly irrelevant" since they "happen at various times throughout the robbery," but this is the full extent of his argument on the subject.  (Doc. 187 at 12-13).  Green does not explain on what ground trial counsel should have objected, how he was prejudiced by the alleged inaction, or what he thinks trial counsel or the court should have done differently.  There is no dispute that the surveillance footage was imperfect; but the jury was alerted to that fact and instructed to draw its own conclusions about how to weigh the evidence and the eyewitnesses' testimony in light of the known gaps in the footage.  Trial counsel's performance as it pertains to the surveillance footage does not fall below an objective level of reasonableness.

### 4.   *Victim Testimony*

Green next asserts that trial counsel should have worked harder to discredit the government's witnesses.  Most of Green's claims in this respect are merely an improper attempt to relitigate the jury's findings.  He argues, for example, that the testimony of victim Dawn Foose that she looked at one of the robbers as she passed

by him is undermined by the surveillance footage, which Green says "shows Foose hurrying past as she looks down into her hands." (Doc. 187 at 9-10). He also argues that the testimony of Foose and another victim that they saw the robber identified as Green briefly pull down his mask is inconsistent with the surveillance footage, which does not "capture a single image [of] the robber with his mask down." (Id. at 8-9).[10] Green's counsel moved for a new trial based on the weight of the evidence— and in particular, the perceived unreliability of the eyewitness identifications—and we denied that motion. (See Doc. 130). Trial counsel did not challenge this ruling on direct appeal, so we cannot consider it on collateral review. See Travillion, 759 F.3d at 288 n.11 (citing DeRewal, 10 F.3d at 105 n.4).[11]

The only ostensible collateral claim asserted by Green sounds in ineffective assistance for alleged failure to impeach one of the eyewitness victims. This claim is arguably untimely. The court of appeals affirmed Green's conviction and sentence on November 14, 2013, (see Doc. 179), and, because Green did not file a petition for

---

[10] We note for Green's benefit that while the surveillance footage does not depict this robber with his mask pulled down, a still image taken from the footage does depict this individual with a hand up to his face at the same time that Foose claimed to have encountered him and observed him pulling his mask back up. (See 8/15/12 Trial Tr. 72:15-73:1; see also 8/16/12 Trial Tr. 175:5-22, 220:7-13).

[11] Green does not contend that his counsel was ineffective for failing to revisit the sufficiency of the evidence on direct appeal. Any such claim would be baseless: his argument goes directly to the jury's credibility findings, and the court of appeals has reiterated that such evaluations are properly reserved for the trier of fact. See United States v. Wise, 515 F.3d 207, 214 (3d Cir. 2008) ("[I]t is not our role to weigh the credibility of the witnesses. Indeed, we must be ever vigilant . . . not to usurp the role of the jury by weighing credibility and assigning weight to the evidence, or by substituting [our] judgment for that of the jury." (quoting United States v. Brodie, 403 F.3d 123, 133 (3d Cir. 2005)) (internal quotation marks omitted) (second and third alterations in original)).

*certiorari* within the prescribed period, his Section 2255 statute of limitations

expired one year and 90 days later, on February 10, 2015, <u>see</u> 28 U.S.C. § 2255(f)(1);

<u>see also</u> <u>United States v. Davies</u>, 394 F.3d 182, 186 n.2 (3d Cir. 2005) (quoting <u>Kapral</u>

<u>v. United States</u>, 166 F.3d 565, 577 (3d Cir. 1999)).  Green's new claim concerning

Foose's testimony was raised years after this deadline—in a supplemental brief filed

in April 2018—and he has not attempted to establish a basis for relation back to his

initial, timely motion.

Assuming *arguendo* that this claim does relate back to Green's initial motion,

the claim is nonetheless meritless.  Green notes that Foose had described both

robbery suspects in a written statement as "light skin black male[s]," (Doc. 252 at

17-18), and he asserts that trial counsel ought to have impeached Foose with this

statement, which Green says "was very different from her testimony at [his] trial,"

(Doc. 252 at 4-5).  Green does not identify a contradictory statement offered at trial,

and our own review of Foose's trial testimony reveals no direct conflict between the

prior statement and any statement made on the stand.

We construe Green's argument as claiming that trial counsel should have

used Foose's written statement not as a prior inconsistent statement *per se*, but to

cast doubt upon Foose's eyewitness identification.  Green contends that he has a

"significantly darker" complexion than the individual depicted in the surveillance

footage and that the reliability of Foose's identification of him as one of the robbers

is undercut by her description of both robbers as "light skin" Black males.  (<u>See</u>

Doc. 237 at 1-2; <u>see also</u> Doc. 252 at 4-5).  He asserts that trial counsel "had in his

hands material for a devastating cross-examination of Ms. Foose on the critical issue in the case" and failed to use it.  (Doc. 252 at 4).

We cannot conclude that trial counsel's declination to pursue this highly subjective line of questioning fell outside the broad range of reasonable professional assistance, particularly when trial counsel did strategically cross-examine Foose in several, more objective areas.  Counsel got Foose to acknowledge that surveillance footage showed that her encounter with the robber she identified as Green lasted only one or two seconds, even though she testified on direct examination that she thought it lasted approximately 30 seconds.  (See 8/15/12 Trial Tr. 105:22-106:19). Counsel noted that the footage seemed to show Foose looking down at something in her hands—not up at the robber as she testified—when she ran past him.  (See id. at 104:11-25).  Counsel pressed Foose at length about her identification of Green during a photographic lineup.  (See id. at 108:4-112:15).  And he underscored the perceived weaknesses in her testimony during closing arguments.  (See 8/16/12 Trial Tr. 218:20-220:25, 222:8-23).  Accordingly, it cannot be said that trial counsel was ineffective for failing to ask Foose about her subjective perception of the robbers' skin tone.

Even if counsel was ineffective for failing to confront Foose with her prior statement, Green has not shown prejudice.  To satisfy Strickland's prejudice prong, Green must establish "a reasonable probability" that "the result of the proceeding would have been different" but for counsel's claimed error.  Strickland, 466 U.S. at 694.  A "reasonable probability" is one "sufficient to undermine confidence in the outcome."  Id.

As a threshold matter, the jury plainly credited Foose notwithstanding certain objective inconsistencies between her testimony and other evidence of record.  Thus, it cannot be assumed that the jury would have changed its mind based on an earlier, subjective description of the suspect's skin tone, especially when that statement was not directly inconsistent with Foose's testimony at trial.  Moreover, Green's suggestion that Foose's identification was "the only evidence against" him is patently incorrect.  (See Doc. 252 at 5).  Julia Korick, a customer present at the bank during the robbery, provided eyewitness testimony as well and identified Green as one of the robbers during a separate photographic lineup and again at trial.  (8/15/12 Trial Tr. 13:19-22:20).  The verdict was also amply supported by inculpatory circumstantial evidence: authorities discovered MapQuest directions to Green's grandparents' address in the getaway vehicle, (see id. at 184:24-185:19), and Green had listed that address as his residence on his driver's license issued just two weeks prior to the robbery, (see id. at 192:12-194:23).  Given the compelling evidence against him, Green cannot show a "reasonable probability" that the result

would have been different had his counsel further attacked Foose's credibility.[12]
See Strickland, 466 U.S. at 694.

### 5.   *Prosecutorial Misconduct*

Green's penultimate grievance targets what he calls "prosecutorial misconduct."  Many of these arguments have been procedurally defaulted.  See Travillion, 759 F.3d at 288 n.11 (citing DeRewal, 10 F.3d at 105 n.4).  Indeed, Green does not even attempt to disguise these arguments as ineffective-assistance claims to get around the procedural-default bar: he frames his challenges as direct attacks against the prosecutor.  Even if these claims were cognizable, they are baseless.

Green first suggests that he was prejudiced by what he recounts as the prosecutor improperly "cosign[ing] for the character of the witnesses in his closing statements."  (Doc. 187 at 11).  It is true that "[a] prosecutor may not . . . vouch for the credibility of a government witness."  United States v. Molina-Guevara, 96 F.3d 698, 704 (3d Cir. 1996) (citations omitted).  A statement is "improper vouching" if it meets two criteria: "(1) the prosecutor must assure the jury that the testimony of a

---

[12] Green also moves to "expand the record" to include two additional pieces of evidence: (1) a "memorandum of investigation" prepared by a private investigator who, based on a review of the surveillance footage, opines that the robber identified by Foose and Korick was "light-skinned," (Doc. 256-1 at 1-2), and (2) a "summary report of findings" prepared by a video technician who, based on an analysis of the surveillance footage and a photograph of Green, offers the equivocal opinion that the suspect appears to have a lighter skin tone than Green, (id. at 3-5). Rule 7 of the Rules Governing Section 2255 Proceedings permits a court to expand the record to consider additional documents relevant to a defendant's Section 2255 motion.  See 28 U.S.C. § 2255 Rule 7.  But there is no basis to expand the record because these reports have no impact on our assessment of Green's claims: the evidence reveals nothing more than that two individuals reviewing part of the record years after trial saw that evidence differently than the 12 jurors who rendered the verdict.

Government witness is credible; and (2) this assurance [must be] based on either the prosecutor's personal knowledge, or other information not contained in the record."  United States v. Harris, 471 F.3d 507, 512 (3d Cir. 2006) (quoting United States v. Walker, 155 F.3d 180, 187 (3d Cir. 1998)).  The court of appeals has held, for example, that the prosecution improperly vouched for a witness when it assured the jury the witness "did not lie" and described as "insulting" and "ridiculous" the suggestion that a government witness might be untrustworthy.  See Molina-Guevara, 96 F.3d at 704-05.  Similarly, the court found to be improper vouching a prosecutor's statement that "We don't take liars.  We don't put liars on the stand.  We don't do that."  United States v. DiLoreto, 888 F.2d 996, 999 (3d Cir. 1989), overruled on other grounds by United States v. Zehrbach, 47 F.3d 1252, 1264-65 (3d Cir. 1995) (en banc).  In both cases, the court underscored that the effect of the statement "was to suggest that the prosecutor knew more than the jury had heard and that it should be willing to trust the government's judgment."  Molina-Guevara, 96 F.3d at 704-05; see DiLoreto, 888 F.2d at 999.

Nothing of the sort occurred here.  During closing arguments, the prosecutor told the jury that "to acquit Tristan Green . . . you have to essentially say Dawn Foose, you are a liar.  Julia Korick, you came in here and you lied when you took an oath and you came up here and sat on that stand and you identified Tristan Green."  (8/16/12 Trial Tr. 248:13-18).  He did not state his own opinion of the witnesses' credibility; he simply told jurors that an acquittal would imply a rejection of the victims' testimony.  And unlike Moline-Guevara and DiLoreto, the prosecutor then walked through the evidence supporting the witnesses' testimony,

identifying corroborative evidence as well as noting that there was no opportunity for collusion, that neither witness had seen the surveillance video before identifying Green, and that they had separately identified him on different occasions out of two different lineups.  (Id. at 248:21-249:3).  In proper context, there is nothing inappropriate about the prosecutor's comments in closing argument.

The balance of Green's prosecutorial-misconduct claims can be resolved in short order.  Green speculates that the government's decision to seek a superseding indictment "was nothing more than an abuse of power as well as a scare tactic" to (1) "force [Green] to give testimony against" another person thought to be involved in the robbery and (2) to "keep [Green] from exposing [the prosecutor's] misconduct during these proceedings by forcing [Green] to take a plea."  (Doc. 237 at 6-7).  He also contends that the prosecutor "strategically coerced 'selected' testimony from witnesses in order to seemingly resemble the government having a strong case." (Id. at 6).  These arguments ostensibly inform Green's theory that the government framed him.  But whether construed as a claim for malicious prosecution or some other violation sounding in due process, such conclusory and vague allegations are insufficient to warrant Section 2255 relief.  See Thomas, 221 F.3d at 437 (citing Dawson, 857 F.2d at 928).

Finally, Green asserts that the prosecutor committed fraud upon the court. According to Green, the prosecutor "presented fraudulent evidence to this court in the form of a motion in which the information contained therein was a veritable contradiction to what was presented by [the prosecutor] during . . . trial."  (Doc. 237 at 7).  It appears Green is referencing the government's statement, in the "factual

history" section of its brief opposing Green's suppression motion, that "[t]he witnesses specifically described one suspect, *who was later identified as Tristan Green*, as being a black male wearing clear surgical gloves, a brown jacket, rolled up blue jeans with brown designs on the rear pockets, a black hat with a red brim[,] and a white shirt as a mask."  (Doc. 44 at 2 (emphasis added); <u>see</u> Doc. 253 at 2). The government's position at trial was that Green was the second robber, identified by eyewitnesses as wearing a black hooded sweatshirt and black mask.  (<u>See, e.g.</u>, 8/14/12 Trial Tr. 98:23-100:14).

The record flatly refutes any claim that the government's misstatement was intentionally deceptive or fraudulent.  The government forthrightly disclosed its error during the suppression hearing.  (3/1/12 Hr'g Tr. 61:13-25).  And even if the misstatement was deliberate—and to be abundantly clear, we have no reason to believe it was—it played no role in our disposition of Green's suppression motion. Our ruling concerned the propriety of two photographic lineups presented to eyewitnesses.  (<u>Id.</u> at 56:20-61:3).  Although Green's counsel noted that Green was dressed differently in his lineup photograph than the other individuals depicted, (<u>see</u> <u>id.</u> at 56:8-19), that argument had nothing to do with what Green was allegedly wearing at the time of the robbery.  This argument, too, lacks plausible merit.

### 6.    *Other Issues*

Green's multiple briefs sweep in numerous other allegations.  He questions how law enforcement were able to obtain a search warrant for his residence based solely on the MapQuest directions found in the getaway car, argues that a search of his residence by his parole officer "produced . . . nothing," and remonstrates

broadly about "conflicting methods of . . . witness statements that were done" and trial counsel's failure to challenge them. (Doc. 237 at 2-3). These arguments appear to be ineffective-assistance-of-counsel claims, since Green posits that "the government may have been forced to drop the case" if his counsel had "taken the proper time to address these issues." (Id. at 3). Without any elaboration or support, these unadorned allegations fail to show that Green's convictions and sentence are the product of constitutional error. See Thomas, 221 F.3d at 437 (citing Dawson, 857 F.2d at 928).

Green also attempts to revisit the propriety of the photographic lineups. He avers that the photographic array was "so suggestive" that he "is sure" it "g[a]ve rise to a substantial likelihood of irreparable misidentification" and thus "should have been objected to . . . by defense counsel." (Doc. 237 at 3). But the array and resulting identifications *were* objected to by defense counsel. Green's trial counsel challenged the lineup on grounds of unnecessary suggestiveness, (Docs. 36-37), we rejected his arguments, (see 3/1/12 Hr'g Tr. at 56:20-61:3), and the court of appeals affirmed that ruling, see Green, 545 F. App'x at 268-69. Green cannot relitigate this ruling on collateral review. See Travillion, 759 F.3d at 288 (citing DeRewal, 10 F.3d at 105 n.4).

Finally, Green purports to raise a substantive "actual innocence" claim at various times throughout his briefing. The Supreme Court has not yet decided whether a freestanding "actual innocence" claim is cognizable under Section 2255. See McQuiggin v. Perkins, 569 U.S. 383, 392 (2013) (citing Herrera v. Collins, 506

U.S. 390, 404-05 (1993)); <u>Reeves v. Fayette SCI</u>, 897 F.3d 154, 160 n.4 (3d Cir. 2018) (citing <u>McQuiggin</u>, 569 U.S. at 392).  It has said, however, that the movant's burden on any such claim "would necessarily be extraordinarily high."  <u>Herrera</u>, 506 U.S. at 416; <u>see also</u> <u>Reeves</u>, 897 F.3d at 160 n.4 (describing hypothetical freestanding actual-innocence standard as "more demanding" than that applied to gateway actual-innocence claims).  Green's cursory assertion that he was framed by the government and misidentified by two eyewitnesses falls short of this high bar.  Accordingly, we conclude that none of the additional arguments distilled from Green's briefs raise viable collateral claims.

**IV.   <u>Conclusion</u>**

For all of the reasons set forth herein, we hold that Green is not entitled to Section 2255 relief.  We will deny Green's motions to vacate and correct sentence pursuant to 28 U.S.C. § 2255 as well as his motion to expand the record.  We will also deny a certificate of appealability, because Green has not "made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  An appropriate order shall issue.

/S/ CHRISTOPHER C. CONNER
Christopher C. Conner
United States District Judge
Middle District of Pennsylvania

Dated:     October 7, 2020